# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2926-22
A-2927-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

T.M. and S.M.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.M.,
B.M., and S.M., minors.

_____

      Argued October 9, 2024 – Decided November 27, 2024

      Before Judges Paganelli and Torregrossa-O'Connor.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0035-22.

Ryan T. Clark, Designated Counsel, argued the cause for appellant T.M. (Jennifer Nicole Sellitti, Public Defender, attorney; Ryan T. Clark, on the briefs).

Kathleen Gallagher, Designated Counsel, argued the cause for appellant S.M. (Jennifer Nicole Sellitti, Public Defender, attorney; Kathleen Gallagher, on the briefs).

Wesley Hanna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Wesley Hanna, on the brief).

Todd Wilson, Designated Counsel, argued the cause for minors (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, on the brief).

PER CURIAM

In these consolidated appeals arising from a joint trial record, defendants T.M. and S.M., the biological parents of minors Juliet, Seth, and Brady,[1] challenge the family court's May 10, 2023 decision terminating their parental rights to each of their children.

---

[1] For purposes of this opinion, we use fictitious names to protect the identities of the minors and refer to defendants by their initials. See R. 1:38-3(d)(12). The children range in ages with Juliet born in 2008, Seth born in 2015, and Brady born in 2017.

The termination decision followed from a nine-day trial, with testimony from multiple witnesses including two experts, the New Jersey Division of Child Protection and Permanency (Division) caseworker, and both T.M., the children's mother, and S.M., their father. Defendants contend the record did not support the court's decision, which T.M. further claims improperly relied on inadmissible hearsay.

After review of the record and the court's seventy-four-page written decision, we discern no abuse of discretion in the court's determination that the termination of defendants' parental rights was in the best interests of each child. The trial court ordered termination after a thorough evaluation of the record under the four requirements of the best interests test, N.J.S.A. 30:4C-15.1(a). We are similarly satisfied that the decision was not grounded in impermissible hearsay, but instead rooted in properly admitted witness testimony and Division records, carefully evaluated under applicable law. We affirm.

I.

The following provides a condensed chronology of the Division's involvement and relevant court proceedings. In early December 2020, Juliet and Seth twice reported significant abuse by both defendants, specifically claiming physical abuse by both T.M. and S.M. and sexual abuse of Seth and Brady by

3

S.M. Seth disclosed that S.M. put Seth's head in the toilet and his "finger in his rectum," among other allegations. Juliet corroborated Seth's claims and described S.M. doing the same to Brady and biting both boys' genitals. Both Seth and Juliet expressed fear of defendants.

S.M. denied the sexual abuse allegations, and both T.M. and S.M. denied physically abusing the children, although they each admitted to physically disciplining their children who they characterized as difficult to control. T.M. admitted to striking Juliet and Seth in the incident most recently reported by the children. S.M. admitted to spanking the children and "pinching their cheeks." Defendants each spoke harshly about Juliet, casting her as dishonest and influenced by maternal relatives. Defendants insisted the children were coached by relatives and fabricated the allegations.

Law enforcement investigated, but no charges were filed. The Division simultaneously investigated and ordered an evaluation of the children, entering into a safety protection plan with the family on December 23, 2020, which required the children to remain temporarily with their maternal grandmother.[2]

---

[2] The Division had previously investigated complaints of neglect against defendants in 2018 and 2019, first about unsanitary conditions in the home and second about the children being left home unattended, but twice closed out involvement.

However, the Division reported that defendants impeded the investigation and failed to meaningfully cooperate with the requested evaluations and offered services.

In January 2021, the trial court granted the Division's application for care and supervision of the children, ordering in pertinent part: (1) that defendants have only supervised visitation with the children, but leaving Juliet discretion over whether to visit her parents;[3] (2) psychological evaluations of both defendants; (3) exploration by the Division of alternative placements for the children; and (4) transportation by the Division for evaluations and services.

In early interviews and evaluations, the children recounted claims of abuse. Juliet described long-term physical and psychological abuse by her parents, starting with her and then turning to her brothers. Defendants repeatedly claimed the children were influenced by family members, and the Division conversely claimed defendants pressured the children to recant. Seth explained T.M. told him to say that he has a "good family life" and everything was "joyful," but nonetheless he repeated his accounts of both physical and sexual abuse in a clinical evaluation. The children's claims, found in significant

---

[3] The court did not initially order that T.M. have supervised contact with the children, but later amended the order to require supervised visitation with both defendants.

A-2926-22

part to be clinically supported, resulted in referrals for treatment based on their evaluations.

Despite the clinical assessment, the Division administratively determined the original claims of abuse and neglect were "[n]ot [e]stablished"[4] based on its inability to confirm or refute whether, and to what extent, the children had been "coached," but the order for care and supervision remained in place as the Division's interaction with the family engendered new concerns about defendants' lack of insight, blaming the children, and resistance to services, thereby placing the children at risk.

More specifically, the Division continued to report significant difficulties with defendants in its efforts to assist the family, alleging defendants impeded scheduling or failed to appear at appointments and refused to undergo psychological evaluations. Defendants expressed mistrust of the Division and described their parenting as intended to protect their children from exposure to unwanted influences, including television and the internet. Conflicts arose

---

[4] The spectrum of potential Division dispositions includes "substantiated," "established," "not established," and "unfounded." N.J.A.C. 3A:10-7.3(c)(1) to (4). A finding of "not established" results when the Division determines it is unable to prove by "a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21, but evidence indicates that the child was harmed or was placed at risk of harm." N.J.A.C. 3A:10-7.3(c)(3).

A-2926-22

between defendants and the children's maternal grandmother and other maternal relatives who claimed T.M. was not adhering to the terms of the safety protection plan. As a result, by May 2021, the children's grandmother and aunt informed the Division they could no longer care for the children.

Immediately thereafter, the Division sought and obtained an order of emergency removal of the children, with the court granting the Division custody of the children and placement with the resource parents, O.A.—T.M.'s maternal relative—and his wife, C.A., after the Division investigated and ruled out other family placement options. The court granted defendants weekly visitation and again ordered T.M. and S.M. to undergo psychological and parenting evaluations.

As the matter continued, the Division determined defendants displayed no empathy for their children or insight into their needs, berated and blamed them and relatives for the situation, refused to meaningfully engage in therapy or services to reunify with their children, and frequently failed to appear for appointments and services, including court-ordered supervised therapeutic visitation with their children. The Division nevertheless continued to pursue

services to assist defendants and reunify the family, seeking bilingual providers or interpreters to accommodate potential language-related issues.[5]

Eventually, defendants underwent the court-ordered psychological evaluations, resulting in recommendations of counseling. However, after defendants eventually complied and attended several sessions, the clinical psychologist discontinued treatment, finding defendants required a different level of care with a forensic psychologist. T.M. only briefly re-engaged with treatment. S.M. attended only one appointment with Dr. Daniel Bromberg, Ph.D., failing to attend all the remaining appointments.

In May 2022, the Division filed its complaint for guardianship and pursued termination of defendants' parental rights. The Division cited mounting concerns about defendants' unwillingness or inability to understand the basic needs of their children, engage in services to assist them, and safely parent their children. The Division represented the children were thriving in the care of their resource parents who wished to adopt them but were opposed to Kinship Legal

---

[5] We note T.M. and S.M. are predominantly Russian speakers, although they are also fluent in English. The children also speak Russian, and Juliet speaks fluent English. The record shows the Division sought and secured Russian-speaking providers and interpreters at times to assist with evaluations and services.

A-2926-22

Guardianship (KLG)[6] based upon defendants' treatment of them and the extended maternal family.

Supervised visitation continued, marked by Division workers claiming they were threatened by defendants, particularly S.M. S.M. also made curious claims including accusing the resource parents of stealing Brady's spinal fluid to sell on the black market and alleging the Division placed a GPS tracking device under his car and the police were following him. Defendants both failed to engage in court-ordered therapeutic visitation with the children.

Dr. Alison Winston, Ph.D., conducted psychological and bonding evaluations of each defendant and diagnosed both with unspecified personality disorders and substantial parenting deficits. Dr. Winston made independent findings as to each defendant and found neither capable of parenting the three children at that time or in the future, opining that further delay in permanency

---

[6] KLG provides an "alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights," in which the court "transfer[s] to [a new] caregiver . . . certain parental rights, but retains the birth parents' rights to consent to adoption, the obligation to pay child support, and the parents' right to have some ongoing contact with the child[ren]." N.J.S.A. 3B:12A-1(b), (c). Importantly, a KLG "[c]aregiver" is one "who has a kinship relationship with the child[ren]," "mean[ing] a family friend or a person with a biological or legal relationship with the child[ren]." N.J.S.A. 3B:12A-2.

would continue to harm the children. The children were each deemed to have an insecure emotional attachment to defendants by contrast to their secure attachments with the resource parents. Each child expressed they did not want to live with defendants.[7] The doctor opined that returning the children to T.M. would place them at risk of "serious and enduring emotional harm," and concluded that reunification with S.M. would similarly risk the welfare of the children. The doctor considered the feasibility of KLG, but concluded it was not a viable permanency option.

The trial commenced in October 2022 and concluded in January 2023. The Division presented testimony from Division caseworker Kimberlee Noordyk, Dr. Winston, and Dr. Bromberg. Defendants each testified on their own behalf, but neither called additional witnesses or provided expert testimony. The judge found the Division's lay and expert witnesses credible, in each instance characterizing the testimony as "clear and consistent," "reasonable in light of the documents admitted into evidence," and "inherently believable." By contrast, the court found both defendants lacked credibility, describing their testimony as "inconsistent," "contradictory," and "circuitous."

---

[7] Dr. Winston testified her particular concern for Juliet after she threatened to commit suicide if forced to return to live with defendants.

The court admitted into evidence the Division's records to provide the chronology of events and to place in context the Division's actions, but ruled that it would not consider as substantive evidence hearsay diagnoses and opinions embedded in reports and evaluations within those records. Defendants specifically challenged the court's substantive reliance upon the clinical evaluations done by the Audrey Hepburn Children's House (AHCH) in the aftermath of the initial abuse disclosures clinically supporting sexual, physical, and emotional abuse of Seth and physical abuse of Juliet. The Division agreed it would restrict its use of those evaluations and similar reports of non-testifying professionals to providing context only for the Division's actions and proposed services.

After trial, in its lengthy decision, the court recounted the testimony and evidence, made detailed credibility determinations, considered the evidence under the applicable legal standards and relevant prongs of the guardianship statute, and ordered termination of parental rights.

## II.

These appeals followed. Both defendants assert that the trial court abused its discretion in terminating their parental rights, alleging the Division failed to meet its burden of establishing by clear and convincing evidence the four

requirements for termination or demonstrate that KLG was not a feasible permanency alternative to termination. Defendants further assert that the court misapplied the standard for analyzing KLG. T.M. argues the court further erred by relying on inadmissible hearsay.

The Division and Law Guardian counter that the court's determination rested on a painstaking analysis of the trial record under the applicable law.[8] Although conceding that at one point the court cited to a prior version of N.J.S.A. 3B:12A-6 when considering KLG, they further assert that misstatement of law was harmless error, as the court made its determinations based on its independent finding that KLG was not an available alternative.

---

[8] We note our receipt of correspondence from defendants' counsel on the eve of oral argument indicating a change in Juliet's placement for a period between January 2024 and May 2024. Counsel notified the court that it deemed the Division's failure to provide notice of this change as violating Rule 2:6-11(d)(3), requiring the Division to advise the court of any change in the placement status of a child during the pendency of an appeal. Defendants asked that the Division comply with the rule and that we allow defendants to address the issue at oral argument, which we did. Defendants argued, without specificity, that Juliet's temporary hospitalization amplified their concerns about Juliet's reliability and her placement with the resource parents, but defendants did not move for remand under Rule 4:50-1. This new information presented during oral arguments did not affect our view of the trial court's decision.

A-2926-22

III.

Termination of parental rights is a matter of great constitutional magnitude and concern. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Parental rights, however, are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012). A parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

The Division must meet a formidable burden to terminate parental rights. Critically, the Division must prove, by clear and convincing evidence, the following four requirements under N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

These requirements "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Child. by L.A.S., 134 N.J. 127, 139 (1993)).

"When a biological parent resists termination of his or her parental rights, the [trial judge]'s function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006). "[T]he cornerstone of the inquiry [under N.J.S.A. 30:4C-15.1(a)] is not whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

"Because of the family court's special jurisdiction and expertise in family matters, appellate courts should accord deference to [the trial judge's] factfinding." Cesare v. Cesare, 154 N.J. 394, 413 (1998). The trial judge's factual findings "should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). We will not disturb the trial court's factual determinations unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova, 65 N.J. at 484).

IV.

Against this backdrop, we evaluate the family court's decision and examine each statutory requirement in light of the evidence applicable to each parent.

A.

The first prong of the best interests test requires the Division to demonstrate that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1); see K.H.O., 161 N.J. at 352. The court may consider psychological

harm and emotional injury in the absence of physical harm. See In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977). Although emotional harm to a child cannot be detected and quantified as precisely as physical injuries, if serious psychological harm is inflicted upon the child by virtue of the parental relationship, the harm element of the best interests test is satisfied. See N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 506-07 (2004).

Significantly, the Supreme Court has clarified that a parent's withdrawal of "solicitude, nurture, and care for an extended period" is a harm that endangers the health of a child. In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999). A judge "need not wait . . . until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383. Further, a finding of harm is not dependent on a predicate finding of abuse or neglect. See N.J. Div. of Youth & Fam. Servs v. A.P., 408 N.J. Super. 252, 259 (App. Div. 2009). While "a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time." K.H.O., 161 N.J. at 348.

"[T]he relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent." N.J. Div. of Youth &

A-2926-22

Fam. Servs. v. M.M., 189 N.J. 261, 289 (2007). A parent's refusal to participate in treatment for substance abuse or mental health concerns factors into the harm assessment when a child is endangered by the parent's condition. See N.J. Div of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 222-23 (App. Div. 2013) ("When the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, the first subpart of the statute has been proven."); see also N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 133-35 (2021); certif. denied, 250 N.J. 395 (2022) (affirming a finding of harm based on "the mother's mental health problems, the parents' repeated failures to complete certain services reasonably offered by the Division, their inconsistent attendance at visitations, . . . their difficulties with housing despite financial assistance," and admission of marijuana use).

Defendants contend the trial court erred in finding the children suffered and would continue to suffer harm because of their conduct. They argue that the trial court presumed harm when there were no physical manifestations of abuse or administrative findings establishing abuse and neglect and insufficient

evidence of any mental health issues or housing instability. They allege that the court failed to identify specific references to any harm or injury. We disagree.

In considering T.M., the court found Dr. Winston's uncontroverted testimony was credible and accepted the doctor's opinion that T.M. lacked empathy for or insight into the needs of her children and "would endanger the safety, health, and development of [her] children" if the children were under her care. The court relied upon Dr. Winston's testimony noting T.M. blamed the children for the "chaotic family dynamic," "physical[ly] abuse[d] . . . the children,"[9] "fail[ed] to properly treat [or acknowledge her] mental health issues," and refused to allow confirmation of stable housing. The court cited Dr. Winston's conclusion that T.M. showed "no motivation for change" and her "parental deficiencies" placed the children at risk of harm if returned to her care.

The court also noted Dr. Winston's diagnostic impression of T.M. indicating "an unspecified personality disorder" and her recommendation that "[T.M.] continue to engage in therapy, although . . . when a[n individual] doesn't acknowledge that there's anything that needs to change . . . then they're not

---

[9] We recognize that there were no "substantiated" or "established" administrative findings of physical abuse. The record nevertheless contained T.M.'s admitting to harshly disciplining and slapping the children, but blaming the children for her behavior, speaking "very negatively about [Juliet] throughout much of [T.M.'s] evaluation" with Dr. Winston.

A-2926-22

going to open up in therapy and really do the work needed to make that change." Dr. Winston opined T.M. "[would] not be able to parent the children" and "[her] opinion [was un]likely to change in the foreseeable future." Thus, the doctor concluded that T.M. "[cannot] provide a safe and stable home for the children" due to a risk of "serious and enduring emotional harm." The court properly relied on this expert testimony in finding T.M. posed a serious risk of harm to the children if they were returned to their care.

The court made similar findings regarding S.M., relying on Dr. Winston's opinions and concluding S.M. demonstrated "a lack of empathy" and "accountability and ha[d] been cruel towards the children," placing blame on Juliet with no insight into the harm this caused the children. The court found S.M., also diagnosed by Dr. Winston with an unspecified personality disorder, did not recognize his own mental health challenges or parenting issues and, without meaningful insight, would continue to place the children at risk of harm. Therefore, the court found S.M.'s "parental deficiencies" would place the children at risk of harm if returned to him. The testimony of Dr. Bromberg and the caseworker supported the court's conclusion that S.M. "never completed any of the recommended mental health treatment programs."

The court tethered its findings as to both parents to "evidence of harm to these children due to the interaction between the parents and the children" derived in part from the caseworker's credible account of the Division's experience with the family and expert opinion. The court found the actual harm to the children and future risk thereof emanated from each parent's detachment from the children and inability to understand and provide for their needs. Credible evidence supported the court's finding that both parents failed to meaningfully engage in Division efforts to rectify their lack of insight, instead continuing to blame and disparage their children, while lacking any empathy or appreciation for the impact of their conduct on their children, placing the children at continued risk of harm.

The court also noted its concerns over the lack of a "realistic housing plan for the children." The Division provided a referral for housing services during the pendency of its involvement after learning the family suffered from housing instability due to financial circumstances. However, defendants decided instead to move to a location described by T.M. as within a Russian Orthodox "monastery—meaning convent"—in New York. The court noted the caseworker's testimony that defendants did not permit the Division to verify defendants' housing, and the court found defendants "failed to permit the

20

Division to see and inspect the current housing." Defendants challenge this finding as unsupported. We are unpersuaded that the court placed undue weight on its housing concerns, which were supported by the testimony from the caseworker. The court found defendants' testimony and description of the housing was not credible and gave reasons for those findings. Finding the caseworker's testimony credible, the court properly considered the housing issue as only one piece of the overall mosaic of potential harm in determining "the children's health and development would be endangered by reunification with these parents."

We briefly address and reject T.M.'s claim that the court improperly relied on impermissible hearsay, particularly the AHCH team's evaluation finding the children's abuse claims were clinically supported. We "review evidentiary determinations by a trial court, including hearsay determinations, for abuse of discretion." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017).

Here, the court properly admitted the Division records under Rule 5:12-4(d) but limited its use of embedded hearsay regarding professional opinions and reports to demonstrate the basis for the Division's recommendations and services. See R. 5:12-4(d) (allowing the Division "to submit into evidence,

pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants"); see also N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 487 (App. Div. 2016) (recognizing "[e]xpert diagnoses and opinions in a Division report are inadmissible hearsay, unless the trial court specifically finds they are trustworthy under the criteria in N.J.R.E. 808, including that they are not too complex for admission without the expert testifying subject to cross-examination").

The record reveals the court adhered to its ruling and based its decision on identified testimony and evidence in the record. Significantly, the court expressly acknowledged that the Division never made an administrative finding of "abuse and neglect," deeming that of "no consequence." It recognized correctly that "[a] finding of abuse or neglect is not required to satisfy [the first] prong."

The court did not rest its harm determination on the initial allegations; instead, it found clear and convincing evidence "the children have been harmed as a result of the parental relationship with T.M. and S.M." Specifically, the court found defendants' "mental health challenges, lack of housing stability, and lack of engagement with recommended services [were] clear and supported by the record." Moreover, any arguable improper reference by the court to

embedded hearsay is harmless as we are satisfied the court rested its findings on properly admitted testimony and evidence.  See N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 30 (App. Div. 2022) (concluding trial court's "reliance upon embedded hearsay and other excludable evidence" did not "prominently undergird[]" its decision, when the court instead made "specific findings . . . exclusively concerned with defendant's parental fitness").

Thus, we are satisfied the court relied on credible evidence in the record and found defendants each unable to safely care for the children now or in the foreseeable future.  Accordingly, we discern no abuse of discretion in the trial court's finding the children's "safety, health, or development has been or will continue to be endangered by the parental relationship[s]."  N.J.S.A. 30:4C-15.1(a)(1).

B.

We similarly conclude the court's finding of prong two was sufficiently anchored in the record as to both parents.  "The second prong of the statutory standard relates to parental unfitness."  K.H.O., 161 N.J. at 352.  The Court has clarified the necessary proof to establish this factor:

> The State must show not only that the child's health and development have been and continue to be endangered, but also that the harm is likely to continue because the parent is unable or unwilling to overcome

or remove the harm. That inquiry is aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child. Alternatively, under this second criterion, it may be shown that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm.

[Id. at 348-49 (citations omitted).]

Courts must assess: (1) whether parents have and are able to sufficiently ameliorate the risk of harm; and (2) if unremedied, whether the delay needed to address and lessen that risk will cause additional harm to the children. See id. at 348. This requirement closely interrelates with the first requirement of the best interests test. See D.M.H., 161 N.J. at 379 ("While the second prong more directly focuses on conduct that equates with parental unfitness, the two components of the harm requirement, N.J.S.A. 30:4C-15.1(a)(1) and (2)[,] are related to one another, and evidence that supports one informs and may support the other . . . .").

The court found T.M. unwilling or unable to eliminate the risk of harm she posed to her children. The record demonstrates numerous instances of T.M.'s failing to attend or impeding the scheduling of evaluations and services, including court-ordered therapeutic visitation with the children. The court relied

on that evidence in reaching its decision.

T.M. claims the court ignored her "many successful family visits" and highlights her completing several sessions with a clinical psychologist in late 2021 before that provider referred T.M. for forensic psychological evaluation and treatment. Here, the court did not overlook, but instead recognized, that T.M. "did engage in some services." The court, however, noted Dr. Winston's opinion that both defendants "failed to engage in the recommended programs in any meaningful way." The court also incorporated into its decision Dr. Winston's view that neither defendant accepted responsibility for their "failure to properly care for the children" and defendants appeared "unable to put themselves in a position to correct the issues that [they] presently have" now or in the foreseeable future.

The court similarly referenced instances in which S.M. failed to follow through with services, noting Dr. Bromberg's testimony that S.M. missed six of his seven scheduled psychotherapy appointments. The court noted S.M.'s non-compliance with court-ordered services and therapeutic supervised visitation without any "credible and reasonable explanation."

We find the record supported the court's findings that defendants were unwilling or unable to "cure[] and overcome the initial harm that endangered the

25

health, safety, or welfare of the child[ren]." K.H.O., 161 N.J. at 348. The court found both defendants made a "very limited attempt at services" and that they caused and would continue to cause the "delay of permanent placement" of the children. The court emphasized defendants' failure to recognize their mental health issues as evidenced by their lack of meaningful engagement rendered them unwilling or unable to rectify the conditions placing their children at harm.[10] The court expressed concern that defendants blamed their children rather than working to gain insight into their own parenting deficits that placed their children at risk of harm.

The court further recognized Dr. Winston's emphasis on the importance of permanency for the children. The court cited Juliet's threat to harm herself if returned to her parents, as well as both parents' limited contact with their children, despite court orders for services designed to remediate the harm and reunify the family. The record reflected many instances in which defendants failed, refused, or only sporadically cooperated with services designed to rectify

---

[10] We recognize defendants argue they do not suffer from mental health conditions warranting concerns for their parenting. However, Dr. Winston's unrefuted opinion reflected that both parents suffer from untreated personality disorders that impair their ability to properly care for and empathize with their children. The court accepted Dr. Winston's testimony as credible, and we defer to the court's determination.

the critical parenting issues which supported the court's finding that the indefinite delay of permanent placement would add to the harm. The court therefore reasonably anticipated significant delay to potential reunification. Thus, we perceive no error in the court's finding further harm to the children would result from an indefinite lack of permanency.

We likewise find unconvincing defendants' claim that the trial court erred in referencing the resource parents' "secure" relationship with the children as a basis of comparison to the children's weaker, "unsecure" relationship with defendants. We do not agree that the court placed improper weight on the relative bond with the resource parents in determining defendants' ability to care for their children as its specific findings regarding defendants belie that claim. See N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 26-27 (2023) (clarifying that prong two as recently amended "ensure[s] that parental fitness— not the child's bond with resource parents—is the core inquiry when a judge considers the best interests standard's second prong in a termination of parental rights case"). The court found and the record supported the court's finding "significant risk" posed by defendants' "erratic and unstable lifestyle." We are satisfied that the court's decision regarding prong two rested on defendants' parental unfitness and their respective failure to meaningfully engage in services

27

to remediate their deficits, independent of the children's relationship with the resource parents.

## C.

As to prong three, the judge found credible the caseworker's testimony regarding the Division's reasonable efforts to provide services targeted to ameliorate the risk defendants posed to their children and both defendants' failure to engage. The court accepted Noordyk's testimony highlighting the Division's offerings: "psychological evaluations, psychiatric evaluations, referral to numerous mental health treatment services, and facilitated visitation with the children." The caseworker also confirmed the Division offered transportation to the children and defendants. Despite defendants' reluctance to comply, Noordyk described the Division's continued willingness to work with defendants throughout the Division's involvement.

The court itemized in detail those efforts and emphasized that the Division "prompted" and "encouraged" visitation with the children. The record reflected Division attempts to provide Russian-speaking service providers and interpreting services. There was ample evidence in the record supporting the court's conclusion that the Division exhausted reasonable efforts to rectify the issues as to each defendant and reunify the family, but defendants each

A-2926-22

demonstrated an enduring unwillingness or inability to engage in the offered services.

The court rejected defendants' claims that they cooperated with the Division's efforts or that the Division failed to offer them necessary services that would have allowed them to comply. We defer to the court's credibility assessments, finding defendants' assertions unsupported by the record. Thus, we see no basis to disturb the court's finding that the Division made the requisite reasonable efforts to provide defendants with numerous and ongoing services to ameliorate their mental health issues, rectify their deficient parenting skills, and repair their unstable relationships with their children. See F.M., 211 N.J. at 452-53.

Sufficient evidence also supported the court's finding that the Division explored alternatives to termination of defendants' parental rights and found none existed in this case. The court found that while the Division sought to provide services to the family with the goal of reunification, it simultaneously explored and secured placement with relatives in furtherance of the goal to "obviate the need for termination of parental rights and [ultimately] adoption." N.J. Div. of Youth and Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 489 (App. Div. 2012).

Here, the court determined KLG was not an available alternative as the Division informed the resource parents and the children about the differences between KLG and adoption and the resource parents unequivocally rejected KLG in favor of adoption. The court also considered the children's desire for adoption and their thriving in the care of the resource parents. The court accepted Noordyk's testimony that "the Division explored several family placement options and thereafter ruled out [other] family members," making the resource parents the only viable family alternative. Dr. Winston also opined that KLG would be harmful to the children as "the . . . parents harbor a great deal of resentment and hostility towards the resource parents," and KLG "wouldn't provide for the emotional security of the children." Therefore, there was substantial credible evidence in the record for the court to find KLG was not a feasible alternative.

Defendants correctly highlight the court's incorrect reference to the prior version of the now-amended KLG statute, N.J.S.A. 3B:12A-6, that no longer requires a predicate finding that "adoption [wa]s neither feasible nor likely" as the KLG statutory scheme no longer reflects a "preference for adoption." See L. 2021, c. 154. We are not persuaded that the court's misstatement of law requires reversal as the court's finding that KLG was not feasible did not rest on

a presumption favoring adoption, but instead upon a determination, supported by the record, that despite the Division's best efforts, KLG was not an available option. Although the court recognized the children were well cared-for by and bonded with the resource parents who wished to adopt the children, we find the erroneous reference to the former statutory standard was harmless and incapable of producing an unjust result. See R. 2:10-2; see also D.C.A., 474 N.J. Super. at 30. The court's determination was not based on the former statutory preference for adoption over KLG.

D.

Finally, the court's finding of factor four—that termination of parental rights will not do more harm than good—is supported as to each defendant. "[T]he fourth prong 'serves as a fail-safe against termination even where the remaining standards have been met.'" N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 559 (2014) (quoting N.J. Div of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "The question is . . . 'not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent.'" Ibid. (quoting E.P., 196 N.J. at 108). "[A] child's need for permanency is an extremely important consideration pursuant to this prong." Ibid. This analysis "cannot

31

require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355.

Instead, "[t]he question . . . is whether, after considering and balancing the two relationships, the child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from the permanent disruption of [their] relationship with [the] foster parents." Ibid. This decision "requires expert inquiry specifically directed to the strength of each relationship." Ibid. (quoting J.C., 129 N.J. at 25). The Court has "long considered a child's relationship with the resource family . . . when [it] applie[s] the fourth prong." D.C.A., 256 N.J. at 23.

Importantly, children should not "languish indefinitely" in a resource placement while a parent attempts to correct parenting difficulties. N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007). Termination is necessary under certain circumstances to allow children to have a secure and permanent home. See N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 595 (App. Div. 1996).

Here, the court relied on Dr. Winston's unrefuted expert testimony to reach its conclusions. See K.H.O., 161 N.J. at 363. As to T.M., the court cited to the record and Dr. Winston's "unrebutted credible opinion" that "to reunify these

children with T.M. . . . would cause the children serious and enduring emotional harm."

Similarly, as to S.M., the court relied on the record and the expert testimony to conclude that "termination of . . . parental rights will not do more harm than good," as S.M.'s lack of progress "indicates that he will be unable to reduce his level of risk to the children to a level that he will be able to safely parent the children . . . within the foreseeable future or within a time frame that would meet the children's need for permanency."

The court further cited Noordyk's "credible" testimony revealing the "excellent care the children are receiving in the resource home" and Dr. Winston's testimony that removing the children from the "stable and nurturing" resource parents "would cause the children serious and enduring emotional harm." The court cited the record and found the children were bonded with the resource parents and negatively impacted by the lack of permanency and the unstable relationship with defendants. Thus, the court's finding that the children would suffer greater harm if removed from their resource parents than if defendants' rights, respectively, were terminated was not an abuse of discretion.

Viewing the court's thoughtful consideration of the interrelated four statutory factors regarding the best interests of the children, we conclude that

33

the court's decision to terminate defendants' parental rights was supported by clear and convincing evidence.

To the extent that we have not addressed all of defendants' arguments, we conclude that they lack sufficient merit to warrant discussion in this written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2926-22